IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

|  |  |
|---|---|
| SILVERPOP SYSTEMS, INC.<br>        *Plaintiff*<br><br>        v.<br><br>LEADING MARKET TECHNOLOGIES,<br>INC.,<br>        *Defendant.* | )<br>)<br>)<br>) Civil Action File No. 1:12-CV-<br>) 2513-SCJ<br>)<br>) JURY TRIAL DEMANDED<br>)<br>)<br>)<br>)<br>) |

## RESPONSE OF  OF LEADING MARKET TECHNOLOGIES, INC. ("LMT") TO SILVERPOP SYSTEMS, INC'S ("SILVEROP") MOTION FOR SUMMARY JUDGMENT BASED ON GEORGIA LAW

As LMT's brief in support of partial summary judgment presented, Silverpop breached the contract between the parties and blithely ignored its tort duties by failing to have in place the necessary protections to prevent intruders from stealing LMT's unique and confidential intellectual property stored in a supposedly confidential LMT access only file in Silverpop's "Engage" database. Silverpop seeks, by its motion for summary judgment, to avoid the duties owed to LMT. Neither the facts nor the law justify their motion. The alleged contract limitations in the parties' contract do not restrict the damages, and the economic

loss rule does not apply to LMT's property.[1]  Silverpop explicitly acknowledged that it was receiving LMT's confidential information and agreed to keep it safe, strictly confidential, and separate as part of the parties' bargain.  LMT Ex. 1, §4[2]. Further, the parties agreed that damages limitations which Silverpop raises in its motion would not apply if the confidential information portion of the agreement was breached. *Id.,* §§ 5.4 and 10.2. Finally, there is no doubt that the hackers exported LMT's data, that there were additional hacking expeditions as Silverpop failed to respond to the first intrusion, and that hackers have the capacity and desire to exploit LMT's data wherever they can. LMT Ex. 23 and 25.

## Statement of Facts

Silverpop made no separate statement of facts in its opening brief and referred to facts only as they arose in support of its arguments. This is not the proper summary judgment approach.  All facts which the opposing party can

---

[1] This brief responds only to LMT's Breach of Contract and Negligence claims. LMT chooses not to rescind the contract and proceed in fraud.  However, as the brief below stated,  Silverpop misrepresented the state of its security protections, and, in so doing undertook to protect against the kind of intrusion which occurred in this case. This is one of the reasons that the economic loss rule does not apply.

[2] Even if it had not explicitly agreed to do so, this is implied in a contract involving receipt of a customer's computerized confidential identifications under circumstances where that information is in the recipient's keeping. *Anderson v. Hasnnaford Bros.,*  659 F. 3d. 151, 158-59 (1st Cir. 2011).

legitimately bring to bear are supposed to be considered by the parties and the Court, and the reasonable inferences to which the opposing party is entitled are supposed to be confronted directly, not ignored.

Silverpop is asking the Court simply to read its accompanying Statement and to draw inferences according to Silverpop's wishes, and, because LMT is able to show that the facts are not as Silverpop states them, it is most appropriate that the facts which demonstrate that there *are* genuine facts which demonstrate that Silverpop's points are hollow should be addressed in direct opposition to Silverpop's points. For context, however, the cogent facts may be summarized as follows:  LMT agreed to use Silverpop's Engage platform and services to send out e-mails to registered users of its MarketBrowser product. MarketBrowser has always been a PC Desktop software product used to provide financial content delivered via the internet which allows its registered users to analyze, plan and monitor their investments.  Clark Dec. ¶2.  MarketBrowser users have registered to receive the information, and in the process, have provided their email addresses and other identifying information knowing that  advertisements will be part of what they receive.   In the parties' contract, they agreed to keep this private information confidential. LMT Ex. 1, §4.  It is valuable intellectual property because it discloses that this list of users is willing to accept advertising and promotional contact useful to its investment decisions.  It provides those to whom

it is published the knowledge of who the registered users are, where they may be reached by email and that these recipients, who are for the most part high net worth individuals, will accept promotional materials over the internet relating to their investment decisions. Clark Dec. ¶ 4.

Silverpop, on the other hand, designated several of its employees to be System Administrators and to be able to access all of the customers' databases. One of those was the technician who opened the extraneous email from a stranger which contained the malware that opened Silverpop's entire computer system. Another of them was the former head of the custom software department who, as a manager not a technical person, had no use for the credentials. He had left the firm some six months before the discovery of the intrusion and still, it appeared, his email account and System Administrator status had not been deleted from the corporate system.  Clark Dec. ¶¶ 11-16.

This comedy of errors permitted the intruders to poke around in Silverpop's computer system for at least a month, and as Silverpop's general counsel testified, "they knew what they were doing." The hackers obtained the credentials of the custom software chief, which allowed them to find the credentials of LMT's System Administrator and impersonate him.  The evidence from Silverpop's logs indicate that Kyle Truax (the former Silverpop manager) starting on October 22,

2010, "became" MSadowski@LMTech.com and accessed LMT's account[3],   *Id.,*

and LMT's 495,100 user list was accessed and imported by the hackers . Clark

Dec. ¶ 4. The actual means for this was Silverpop's VPN system which allowed

Silverpop employees to access the internal system remotely by simply typing in the

user's name and password. In this instance, the hackers pretended to be Kyle Truax

who was accessing "his" account inside Silverpop, saying that "he" was doing so

remotely from Amsterdam. Silverpop had no detection device to question, weed

out, or deal with such a claim, and the intruders proceeded right through to LMT's

data.

Silverpop has not disputed this description of the incident in its Statement of

Material Facts. It has, however, stated other "facts", some of which LMT disputes,

but almost all of which LMT says are irrelevant.  These are treated, as necessary,

below.

---

[3] This is the typical method that Silverpop employees utilized to access particular accounts. Thus, a Silverpop employee, designated a System Administrator, could impersonate a customer's System Administrator's credentials to access that customer's account. After the incident, Silverpop required its System Administrators to obtain written permission before impersonating a customer.

# **ARGUMENT**

## I.  SILVERPOP SHOULD NOT BE RELIEVED OF  ITS CONTRACT BREACH

### A.  SILVERPOP HAS NOT DENIED LIABILITY UNDER SECTION 4 OF THE CONTRACT

At least for summary judgment purposes, Silverpop makes no argument in its moving papers  to deny that it agreed to keep LMT's secret information confidential, that the potential for the type of intrusion into its system which occurred was anything other than well-known, and that it failed to meet the requirements of Section 4 of the contract regarding safe-guarding LMT's confidential information.

### B. LMT *HAS* PROVEN ITS DAMAGES

The market value of the asset that was destroyed in the theft was LMT's key secret, namely, the MarketBrowser users' identity and contact information , and the secret knowledge intrinsic to it, that these users agreed to accept MarketBrowser with the expectation that that there would be advertising and promotional content sent to them as a result. This is very valuable knowledge to a series of potential buyers—competitors, brokerage firms with on-line capabilities, money management firms, and even scam artists. Silverpop does not dispute that LMT's agreement with the users makes it clear that they are willing to accept these, nor does it dispute that the people's identities, contact information, and

preferences are confidential. LMT's damage claims have been consistent throught the litigation. See LMT Ex. 21, p.10.

1. The Sale Value *Was* Destroyed.   Silverpop first argues that there is no credible proof that the ability to sell the list and associated intellectual property was destroyed by the hacking and export of its information. This is not like a case in which a trade secret is stolen by an employee as he leaves the firm. In that situation, it behooves the recipient to keep the information confidential to just the original company and his (or her) destination.  Damages can be measured by the recipient's gains. But, commercial exploitation limited to two is much better than potential exploitation by many for various legal and illicit purposes. This is what happens when sophisticated hackers steal confidential identities. They will want to exploit (i.e., monetize) their yield. Nebel Op., LMT Ex. 5; Prosser Op. and Affidavit, ¶ 7(b)(1)(4), LMT Ex. 20A.[4]

Silverpop argues that, even where the list has been hacked so that both LMT and Silverpop lose control of it—where there always is the risk of wide publication—the sale value of the asset is not zero. Silverpop produces absolutely no evidence to support its position. No expert, no one working in the field, none of

---

[4] Mr. Prosser, who has worked in this field for 15 years, and had dealings with LMT over those years as FXCM's Marketing chief, has been subjected to an entirely unwarranted personal attack in a recent, desperate motion filed by Silverpop. Response to it is beyond the scope of this memorandum.

its employees, have taken such an impractical position. Nor does any document that it has produced say so.

Instead of producing evidence, Silverpop claims that LMT, with the burden on the issue, has produced no "credible" evidence to support the loss of value. It has ignored the evidence and the practical understanding of how hacking works in the internet business world.   It has attacked Steven Clark's opinion that the property has lost its value simply on the basis of opposing counsel's point of view. To the contrary, Mr. Clark, as a principal of LMT who has worked in the field for almost 25 years and has worked with MarketBrowser on a daily basis before and after the incident, who was involved in the brief negotiations by which an arms' length buyer sought to purchase MarketBrowser, and who tracks developments in the field, including purchases and sales, on a regular basis, is well-situated to know whether the asset has lost all of its sale value. He has testified that it did. As an owner, he has particularized knowledge of MarketBrowser's worth as an ongoing business and as a saleable asset. *Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co., Ltd.,* 320 F.3d. 1213, 1222 (11th Cir. 2003);  *U.S. v. Suhadolnik,* 492 F.3d. 380, 402 (6th Cir. 2007) (Opinion testimony as to value by business owners is "one of the prototypical areas intended to be left undisturbed " by amendments to Rule 701).  Georgia law is consonant with this view. *Barnes v. The State,* 239 Ga. App. 495, 497 (1999).

Likewise, Silverpop has attacked the much-maligned Mark Prosser, who, after all, was involved in the due diligence process which resulted in several deals by which internet companies were purchased by his former employer (he left after participating in the firm's IPO). Mr. Prosser's opinion, which LMT will show is well-considered, is that no rational buyer will purchase a list like this which has been the subject of hacking and data export because of the risk of multiple disclosures and spamming attacks. LMT Ex. 20A, ¶¶ 6, 7, and 8. The foundation for his opinions lies with his personal experience and knowledge of how hackers and the purchasers of lists like the one at bar, actually work. Contrary to the position Silverpop has taken in its recent motion, Mr. Prosser is not required to come at this kind of knowledge from an academic background, nor need it be quantitatively verified. Silverpop knew of Mr. Prosser and his opinion well before discovery closed and had weeks to find a counter expert. That it was unable to find one speaks volumes.

The case law recognizes that when a trade secret is published, its sale value as a secret is destroyed.  This is because, when a secret is learned and exploited by one who also has reason to limit its publication, the owner may be able to be fully compensated through royalty payments. But, when the owner has no way of limiting the recipients, there is no sale value, because a buyer cannot be sure that

the confidential, proprietary   information will remain so. The property is permanently destroyed.[5]

       2.  <u>Sale Value and Rental Value Are Separate, Unrelated Concepts.</u>

Silverpop has wasted a lot of time in an effort to confuse and confound LMT's property damage claims. Rental value—use of a property to gain income and sale value are different concepts, and, in Mr. Clark's deposition, he resisted Silverpop's efforts to confuse the two. The record makes it clear that Mr. Clark's position was that, although the list could be used now for LMT's purposes to gain some (reduced) revenue, the sale value is destroyed, and that these are two different values.  At page 163, he testified, "It's really a two-part answer. The asset value I would argue has basically gone to zero. The ongoing operation, it took a serious hit, but it didn't quite go to zero." LMT Ex. 10 Part 2.

---

     [5] In *University Computing Co. v. Lykes-Youngstown Corp.,*  504 F. 2d 518, 535 (5th Cir. 1974), the Court wrote that measuring the loss from the plaintiff's point of view makes sense " only when the defendant has in some way destroyed the value of the secret. The most obvious way this is done is through publication, so that no secret remains." However, where the secret remains between the owner and the taker, as it was in that case, the taker's gain either through profits or royalty is preferred.  Although the Court counseled flexibility, it required a royalty approach in that case. It goes without saying that the Fifth Circuit could not have foreseen the internet, hacking, and the potential for continued and multi-purpose exploitation by hackers through sale of a confidential list to exploiters which makes this situation much more like a publication than limited, but continuing secrecy.

Still, Silverpop claims that the value of the asset has not been lost because LMT has the ability to use it. However, in his declaration, Mr. Clark puts this position to rest as a business matter. As Paragraph 7 states, in pertinent part:

I notice that Silverpop in its Statement of Facts confuses my testimony about rental value and asset value. To explain why there was a substantial injury to our intellectual property, and to explain that the loss of the asset value is a different concept than loss of rental income, I would like to suggest an example: if a grocery store has a liquor license and much of its sales come from the sale of wine and spirits, that business, including the license, has a saleable value. It also has a value based on its receipts. If the store loses its liquor license, the value of both the license and the business are lost. If, however, the store is informed by the authorities that the license cannot be sold or transferred, the business can continue, but the market value of the license is lost as soon as it is informed that it is not permitted to sell or transfer the license. The harm is complete when this occurs. In this case, MarketBrowser's market value was lost when the list was taken and we were informed about the incident, because, as of that date, the list could not be sold for what it was, namely, a confidential list of high net worth customers who trusted us enough to receive advertising and other promotional materials from us. It is only when a confidential list of high net worth users is unimpeachable that is has a sale value. To "close the loop" on the point I am making, a business owner has only three ways to make money from an asset. In our business, founders can only maximize value, that is, "capitalize" their business, with an "exit"—by going public, selling the business, or through a merger which ends up with cash or a cash equivalent. Virtually everybody in the business we are in is aware of this. A company like FXCM, the financial service provider who had preliminary discussions about purchasing MarketBrowser in 2009—realizes that sale or public offering is all that is possible to capitalize an asset like ours, and for a company our size, the public offering option is not an option. Thus, the MarketBrowser business is worth only what a willing buyer is willing to pay for it. Therefore, Jay Smith's and my plan has always been to sell the MarketBrowser line once it reached appropriate size and gravitas.

Georgia law recognizes this difference and permits damages as to both, recognizing that profits from business operations and loss of the of property may

be separately compensated. In *Action Sound, Inc. v. Department of Transportation,* 265 Ga. App. 616, 618-620(2004), a condemnation case, the Court reversed where the trial court confused and failed to separate the two concepts. Its charge conflated "business properties" with "business profits." Where the jury could have found that the property itself was destroyed by the taking, the plaintiff was entitled to compensation for both. The Court quoted *Bowers v. Fulton County,* 221 Ga. 731, 739(2) (1966): "The destruction of an established business is and must be a separate item of recovery." In *Royal Capital Development, LLC v. Maryland Casualty Co.,* 688 F. 3d 1285 (11th Cir. 2012), the Court considered the trial court's grant of summary judgment where a building owner sought damages for the permanent diminishment in value to a building even after the insurance company had paid for its full repair. After certifying the question to the Georgia Supreme Court and receiving the unanimous opinion of that Court that, under Georgia law, payment under a policy limiting coverage to "direct physical loss of or damage to property" requires coverage for both, the Court reversed the District Court's grant of summary judgment.

As the above decisions suggest, there are simply no cases in Georgia which state that in a property loss case, loss of market value is not an element of damage. Further, in bailment cases, "the measure of damages is the fair market value of the property, that is, if lost, destroyed, or simply not returned, the measure of damages

is the difference in the market value immediately before and immediately after the damage." *Letteer v. Archer,* 160 Ga. App. 373, 374 (1981). In common carrier cases, (which are somewhat analogous to the case at bar), the loss is usually measured by "the market value rule." *Eastman Kodak Co. v. Westway Motor Freight, Inc.,* 949 F. 2d 317 (10th Cir. 1991). Mr. Clark's understanding of how value is determined in his industry is precisely in line with the applicable law in this case.

### 3. LMT's Expert's Opinion, Based on Discounted Cash Flow (DCF) Is Not A Lost Income or Profits Claim.

In another effort to confuse and confound, Silverpop has refused to recognize the Discounted Cash Flow method of valuation for exactly what it is—a method for determining the fair market value of a going business or property for purposes of sale to a willing buyer. Instead, Silverpop makes the (ridiculous) argument that it is a lost income or lost profits approach.

In the DCF, sometimes referred to as Discounted  Income Valuation, the expert takes the annual results of net cash flow[6] from several past years of business performance and then projects it forward, plugging in an inflation factor. The

---

[6] Net cash flow is simply a company or property's total receipts less its total expenses, subtracting from those expenses the interest, taxes, depreciation and amortization paid. This produces E(arnings) B(efore) (Interest) T(axes) (Depreciation) and A(mortization), or EBITDA, the business or property's net cash flow.

number of years projected forward depends on the numbers used for sale and purchases in a particular line of business (the question is whether lines of business or properties usually sell at 10 times the cash flow (10X) or more or less). The inflation factor is taken from published economic statistics and the art involves determining whether thirty years or more is the right percentage to use. After this is calculated, a discount rate—based, again on published rates of return—is used to reduce the number to the net present value of the business or property. LMT Ex. 20B, p. 12. It is definitely <u>not</u> a method for calculating lost income or profits. The sole purpose for the exercise is to value the business, line of business or property for sale as a going concern. *Id.,* p. 3, 12.  *Cox Enterprises, Inc. v. News Journal Corp.,* 510 F.3d 1350, 1355 (11th Cir. 2007).

Several courts have cited the Discounted Cash Flow Method favorably as a way of valuing an asset or line of business, some referring to it as the preferred method. *Sturm v. Marriott Marquis Corp.,* 85 F. Supp. 2d 1356, 1364 (N.D. Ga. 2000);  *MSF/Sun Life Trust-High Yield Series v. Van Dusen Airport Services Co.,* 910 F. Supp. 913, 938-44 (S.D.N.Y. 1995); *Koch v. Koch Industries, Inc.*, 2 F. Supp. 2d 1385, 1402-06 (D. Kan. 1998); *Blue Marlin Dev. LLC v. Branch Banking and Trust Co.,* 302 Ga. App. 120, 121-22 (2010); *Greenwood Homes, Inc. v. Regions Bank,* 302 Ga. App. 591, 593-95 (2010).

Here, it would appear that Silverpop found the expert's report and approach to be suitable. It did not hire another expert to debate either the method or the results. It might be inferred that the use of DCF is so well-established that it would not be useful to debate it, and, further, that the inflation and rate of return rates used were conservative enough that it would not have been wise to refute them. At any rate, at least for these purposes, LMT has produced a credible expert who valued the MarketBrowser line—which amounts to its list of users and their contact information attached, and the confidential knowledge inherent to that of their willingness to use a product like MarketBrowser provided over the internet to inform investment decisions. This was not an effort to determine lost profits.

### 4.   LMT's Claim is Not For Loss of Corporate Goodwill

In accounting terms, Goodwill is an intangible asset which concerns certain assets of a corporation which cannot be accounted for otherwise. Silverpop has completely misused the concept. It claims that, because the willingness of MarketBrowser's users to accept unguarded stock and bond market information over the internet and to continue to use MarketBrowser, knowing that they will receive advertising and other promotional materials,  is referred to in the industry as "trust," LMT's damages claim amounts to a loss of goodwill. That is completely false. While the industry might put a higher value on a confidential list because

there is some relational value, and this is an attribute of the asset being sold, that has nothing to do with this case. The asset that was destroyed was the value of the list altogether—it is, at its heart, a property damage claim.

It is a measure of Silverpop's desperation to confound the damages claim that it would even attempt this misdirect.

### 5.   LMT's Damages are Not Consequential Damages

LMT has written quite a lot, already, relating to Silverpop's "consequential damages" defense. Section 5.4 of the parties contract indicates that all of Section 10, including the reference to consequential damages in Section 10.1, did not survive termination[7].

Under Georgia law, contract damages are those which naturally flow from the breach, OGCA Section 13-6-2; and those consequential damages which can be traced solely to the breach are recoverable as well.  OGCA Section  13-6-8. Even if Section 10 of the contract did apply, it is doubtful that the damages sought in this case would be termed consequential—they are certainly not remote, and they flow directly from the breach of the contract.

---

[7] Silverpop refers to  its decision to "suspend" service in May, 2011 in its Statement of Facts. It does not claim that any later service order was accepted or served. Under the amendment to the parties' contract, LMT Ex. 2, this fact alone establishes termination.

As previously stated in the opening brief, Georgia law calls loss of an asset's value as the result of a sudden, but foreseeable incident, property damage in a contract and tort case. *Royal Capital Dev., LLC v. Maryland Cas. Co.*, 688 F.3d 1285, 1288-89 (11th Cir. 2012). The loss of market value is a direct injury, not consequential damages. *NUCO Invs., Inc. v.  Hartford Fire Ins. Co.*, 2005 U.S Dist. LEXIS 33350, at *6-14 (N.D. Ga. Dec. 5 2005); *Metro. Atlanta Rapid Transit Auth. v. Dendy*, 250 Ga. 538, 541-42 (1983).

The out-of-state cases cited by Silverpop have no application to this case, but one of them is instructive. In *Allen Bros. v. Abacus Direct Corp.*, 2003 U.S. Dist. LEXIS 27751 (N.D. Ill. May 13, 2003), cited at page 13 of Silverpop's brief, the Court rejected a claim for the lost value of a list, noting that the plaintiff claimed only loss of business use (income and exploitation as a business opportunity), and not loss of a thing with some intrinsic value, such as a gold coin, which might be less valuable at a particular moment in business but retains an inherent value. This is exactly the distinction that LMT is drawing, and it is the inherent value of the list—its identity as a confidential secret list for sale purposes, not loss of rent (which LMT also could have claimed, but did not) which is the basis of the property damage claim. A full reading of the Court's language indicates that what that court had in mind was that a business advantage meant the ability to exploit the list to build its revenues, as contrasted to a claim that the list

itself was ruined or seriously and permanently damaged, and the market value harmed.

Here, because what is being sought is the loss of the inherent value of the list, measured by its market value on sale, the claim is the opposite of a loss of income claim as was presented in *Allen Bros.* Further, as is shown below, the damages claimed in this case flowed directly from the hacking incident.

## 6.  The Hacking Incident Caused LMT's Damages

Silverpop has constructed a straw man from which to fashion a mistaken causation argument. In actuality, LMT's causation claim is that the hacking incident, once disclosed, ruined the list's value. The casue and effect could not be more direct.  Silverpop's argument, that the development of proof that the business spiraled downward starting about six months after the incident, is LMT's sole proof of cause and effect, is wrong. These effects which also may well have been related to the incident is not LMT's proof of causation; it is a demonstration of the kind of question which a rational buyer looking to purchase the list would ask, once that buyer has been told about the hacking incident.

Without any support, Silverpop argues that LMT has not shown that the hacking incident necessarily ruined the list's value because, it claims, it has not been shown that a rational buyer would necessarily learn of the incident. To the contrary, the sharp decrease of revenue would only enhance the certainty that a

rational buyer would ask, that LMT would have to disclose, and that the buyer would walk away. Silverpop has, in this instance, turned the summary judgment rules inside out. If LMT has produced any evidence to support causation, and Silverpop has not produced contrary evidence, summary judgment must be denied.

The causal facts which LMT has produced may be summarized, as follows:

After successfully spear-phishing Chris Wright's account, the hackers gained access to Silverpop's corporate systems. They then spent weeks prowling at will through those systems and learned of the System Administrator credentials of Kyle Truax, who had left Silverpop months before. (The Truax account had the privilege to impersonate the LMT account without LMT's knowledge).  Further, the Truax account could be accessed from outside the Silverpop premises on computers not issued by Silverpop, specifically, from the Netherlands in LMT's case. The hackers also discovered from Silverpop's system the existence of our list and of our (LMT's) sole System Administrator, Marc Sadowski (M.Sadowski@LMTech.com). Utilizing that information—none of which should have been available on Silverpop's corporate MIS system, the intruders logged in through Silverpop's VPN system into the corporate system, and utilizing Truax's powerful credentials, exported LMT's entire list of active users.

The direct effect of this is that, upon disclosure, no rational buyer would purchase the list. The ability of sophisticated hackers to use and sell the list

multiple times has too much risk. As a result, Steven Clark, a principal of LMT and someone employed at a high level in this industry since its beginnings, has testified that the fact of the hacking and export would have to be disclosed to any buyer and that ruins the chances for sale. Mark Prosser, who has also been employed at high levels in the industry, has testified to the same thing. Silverpop, with no proof, doubts that the testimony that ethics, good business practices, reasonable due diligence, and the refusal to purchase a list until its risks are known raise, at least, a jury question and that the facts as they are would be disclosed in the sale process and that this would throw cold water on a potential deal. Silverpop asks, who are these people, as mere high level industry people, to have such an opinion? LMT responds: who are lawyers, with merely their own questions about ethical practices and no business people or other evidence to support them, to ask, based on their *ipsi dixit,* whether such facts would be more likely than not to come out in the due diligence process before a sale. As will be shown, Mr. Prosser's opinions are well supported by his business experience. Further, Mr. Clark knows, as he has testified, that the only path to realization of the full value MarketBrowser asset is through a sale and that that potential has been quashed, in the real world.

### 7. Silverpop Has Not Moved For Summary Judgment On Its Claims

Finally, Silverpop brought this action originally on the pretext that it was owed money for services rendered under the parties' 2005 contract. It has not moved for summary judgment on its claim.

It would have no grounds to do so. As Mr. Clark has testified, after the incident was disclosed to LMT, the parties agreed to suspend the contract until it was determined whether or not LMT would renew it in July, 2011, and Silverpop requested that LMT utilize its services with the question of payment reserved until it was finally determined whether or not the contract would renew—and, if it did not, there would be no payment. LMT agreed to this, made one payment to bring the account current, and continued to utilize the services on that provisional basis. As Silverpop explained would happen, LMT received invoices during this period but received no requests for payments, dunning phone calls, or other communications for the next five months. The requirements of OGCA Section 13.4.4, relating to mutual departure from contract terms, have been met.

### II.  LMT Has A Valid Negligence Claim

### A.  Silverpop Was Extremely Negligent, as Mr. Nebel Has Opined.

Silverpop has chided Roger Nebel, LMT's security expert, for failing to define what he means by his finding that Silverpop was "extremely negligent", and that this permitted the intruders not only to hack in, but to prowl through its computer system and steal LMT's confidential property. It is not an expert's job to define the law of negligence for a Court. It is the Court's and jury's province to do so. LMT is happy to let the facts decide. The hacking occurred as described above—and no one doubts that.

As to what was lacking in Silverpop's protection system, some facts are in genuine dispute, but as Mr. Nebel and Mr. Clark have noted, it is beyond dispute that Silverpop had no intrusion detection system with which to detect suspicious activity, it had gone way overboard in issuing privilege credentials to its employees which allowed them to search the confidential data of customers like LMT—even a high ranking executive of Silverpop was surprised by the extent of credentials issued, see LMT Ex. 22—it did not respond to the spear-phishing incident by carefully monitoring its system to be on the lookout for the intruders, it did not train employees like Chris Wright not to open emails of a personal or business nature from unusual sources, it allowed free usage of the VPN system from any computer located anywhere, and, if all that were not enough, it failed to let customers like LMT know that the intruders had exported their confidential data so

that the customers could protect their own computer systems and those of their users. Nebel, LMT Ex.5, ¶¶ 16-24; Clark Dec. ¶¶ 12-16[8].

In the face of this evidence, Silverpop still doubts that it had a duty to protect the confidential information it agreed to accept, store, and safeguard. To the contrary, Silverpop undertook to do so. First, it was in the inherent nature of its holding the data and storing it, that it did so. OGCA, Section 23-2-58; *Cochran v. Murrah,* 235 Ga. 304 (1975); *Monitronics Int'l, Inc. v. Veasley*, 2013 Ga. App. LEXIS 657 (Ga. App., Jul. 16, 2013). Second, it is in the nature of the representations it made on its website and orally that is assumed the duty. See Clark Dec. ¶¶ 17 and 18. The parties may differ as to whether or not the representations Silverpop made relating to access control, protection against intrusion and so forth amount to fraud, but there is no doubt that Silverpop was telling its customers, and, indeed, the world, that it was undertaking to protect data stored within its databases.

As such, there is an imposing case upon which a jury, guided by instruction, could legitimately find Silverpop to be negligent.

---

[8] While it certainly not dispositive of summary judgment, LMT notes that it objects to use of Kelly Thompson's Rule 30 (b) (6) depositon to fill in gaps in its security system. Ms. Thompson, who joined the company in 2009, had to rely on the recollections of others to testify about the security system. Her testimony was hearsay. LMT Ex. 24; Fed. Rules  56 (c)(2).

B. The Economic Loss Rule Does Not Apply.

Most of Silverpop's powder in trying to gain dismissal of the negligence claim has been expended in its support of the application of the Economic Loss Rule. It is an exception to damages rules which, while well-accepted, has numerous exceptions, two of which apply to LMT's negligence claim.

1.    The Defense Does Not Apply Because of The "Other Property" Exception.

LMT seeks to recover the value of its intellectual property, which it entrusted to Silverpop for the purpose of sending periodic e-mail advertisements to LMT's customers on the list. The list remained LMT's property through the course of its dealings with Silverpop, and it was stored separately by Silverpop, as the company kept all of its customers' proprietary lists as separate and distinct assets, never mingling their content and never integrating them into the Silverpop product. That product, Silverpop's Engage platform, constituted the subject of the parties' product license and service agreement and, ultimately, the breach into it was the proximate cause of the injury sustained to LMT's property. LMT's intellectual property remained outside the scope of the product and played no role in the hacking accident. "[E]quipment added to a product after the Manufacturer … has sold the product to an initial User is not part of the product that itself caused physical harm. Rather, … it is 'other property.'" *Saratoga Fishing Co. v. J.M.*

*Martinac & Co.,* 520 U.S. 875, 884 (1997). It is well recognized in Georgia that where the injury occurs to "other property," meaning not to the defective product itself, the economic loss rule does not apply. *Id.*; *Carrier v. Jordan,* 746 F. Supp. 2d 1341, 1348 (S.D. Ga. 2010) (personal property recoverable from sunken ship); *General Electric Co. v. Lowe's Home Centers, Inc.*, 279 Ga. 77, 79 (2005) (allowing recovery in tort for damage to plaintiff's own property); *Sam Finley, Inc. v. Barnes,* 156 Ga. App. 802, 802-803 (1980) (recovering damages to plastic surface of roller rink caused by negligent construction of asphalt base). Because LMT's intellectual property played no causal role in the accident, and is extraneous to the Silverpop "Engage" product, it must be regarded as "other property" that sustained damage as a result of Silverpop's negligence.

*Huddle House, Inc. v. Two Views*, Inc., 2013 U.S. Dist. LEXIS 48754 (N.D. Ga. Apr. 4, 2013), cited by Silverpop is inapposite in this case, where the property damaged by Silverpop's negligence is not, as it was in *Huddle House*, "the thing sold" – the bargained-for product at the core of the parties' license agreement . Here, the damage was sustained by LMT's proprietary asset that is outside the scope of the Silverpop system[9].

---

[9] Silverpop has made more use of the case than is appropriate. *Huddle House* is a trademark infringement case in which the plaintiffs tried to turn the misuse of the plaintiffs' trademark into something more than an infringement case. Whether or not the loss of a trademark would be property damage is not decided in the case—it was merely the use of the trademark that was at issue. Trademark

2.   The Defense Does Not Apply Because of The "Sudden Accident" Exception.

The damage to LMT's property resulted from a hacking – a sudden and calamitous event enabled by the deficient security system of Silverpop. The accident crippled the defective Silverpop security system and posed an unreasonable risk of injury to LMT's proprietary list, the value of which was destroyed the moment it became "publicly" available for purchase or use as the hackers sought to monetize their yield. The hacking incident occurred suddenly, it was not the culmination of gradual erosion of quality or deterioration of components within the Silverpop product over time. This is a well-known exception to the economic loss rule that applies to this case. *Gainous v. Cessna Aircraft Co.*, 491 F.Supp. 1345, 1346 (N. D. Ga. 1980) (allowing a cause of action for negligence when disengaged propeller caused airplane's crash landing); *Lumbermen's Underwriting Alliance v. Blount Int'l., Inc.,* No. 3:05-CV-064-JTC, 2007 U.S. Dist. LEXIS 102300, at *6 -*7 (N.D. Ga. Feb. 5, 2007) (accident exception applied when HydroAx burst into flames). *Cf. Busbee v. Chrysler Corp.*, 240 Ga. App. 664, 667 (1999) (finding no evidence of calamity when unmaintained car engine broke down at rush hour). Silverpop's defective security

---

infringement damages are classically awarded on the basis of state and as royalty damages, as the Court held. That is not tantamount to the expropriation of the list by hackers who can publish it to anyone and everyone at will without accountability.

system facilitated a hacking calamity that vitiated the value of LMT's intellectual property when hackers struck and exported the list. Though the hacking incident was foreseeable, Silverpop unreasonably failed to guard against even the most obvious and unsophisticated hacking techniques when that the hackers struck and exported LMT's proprietary list, destroying the value of its intellectual property which, like that of a trade secret, inhered in its secrecy. Because LMT suffered property damage as a result of a sudden, violent, foreseeable accident, the economic loss rule does not bar its cause of action in negligence. *Vulcan Materials Co. v. Driltech*, 251 Ga. 383, 386-388 (1983) (recognizing accident exception in Georgia).

C. Silverpop's Misrepresentations Provide Another Exception.

As Paragraphs 17 and 18 of Mr. Clark's declaration point out, Silverpop has soft-pedaled the representations it made prior to the incident. On its website, to which LMT was specifically directed, Silverpop cited to "24-7 automatic monitoring," which meant that it had systems in place that have continuous surveillance for aberrations, security breaches, intrusions, and other insecure activity. The discovery has shown that Silverpop actually had no intrusion detection devices installed on its system, nor did it have a 24-7 SOC facility until these were installed after the breach. Second, there were specific authentication representations, the incorrectness of which manifested in 2010, that run contrary to

Silverpop's claim that it had state of the art access control.  Specifically, Silverpop allowed the ability to log in from a remote geographic location which was not inside of the trust network of Silverpop itself.  Thus, the system did not react to an obvious, unusual intrusion from a terminated employee accessing the network from a non-Silverpop computer located in the Netherlands.  Silverpop did not have any business saying "we have access control that makes you secure." Further, Silverpop's representation that it had state of the art system security is wrong.  This is evident from the fact that the hackers had malware running for two weeks or more on its system, which is inconsistent with even basic system security.

Further, Silverpop told LMT that it had tight control over internet protocol addresses within Silverpop, which was not true, otherwise the system never would have allowed an IP address in the Netherlands to reach LMT's data.

LMT agrees with Silverpop that it cannot pursue its fraud claims, because it has not formally rescinded the contract and because it was willing to go along with an interim agreement to continue to accept services provisionally after the incident. However, while it is an open question, this should not prevent LMT from raising the "misrepresentation exception" to the Economic Loss Rule. . *Malta Constr. Co. v. Henningson, Durham & Richardson, Inc.*, 694 F. Supp. 902, 906-907 (1988) (economic loss rule does not bar plaintiff from proceeding on allegations that

defendants negligently provided deficient plans and drawings).  *Robert & Co., Assoc. v. Rhodes-Haverty P'ship,* 250 Ga. 680, 681-682 (1983) (negligent misrepresentation in engineering report furnishes an exception to the economic loss rule). *City of Cairo v. Hightower Consulting Eng'rs, Inc.,* 278 Ga. App. 721, 729 (2006) (false information in a soil evaluation report triggered the misrepresentation exception). *Bates & Assoc., Inc. v. Romei*, 207 Ga. App. 81, 83 (1993) (faulty mechanical drawings may constitute misrepresentation, to which the economic loss rule does not apply).

## CONCLUSION

For all of the above-stated reasons, the Plaintiff's Motion for Summary Judgment should be denied.

LEADING MARKET TECHNOLOGIES, INC.

By their attorney,

/s/ *Edward T. Dangel, III*
Edward T. Dangel, III BBO # 113580
Dangel & Mattchen, LLP
10 Derne Street Boston, MA 02114
(617) 557-4800
tdangel@danmatllp.com


s/ *Jonathan Marigliano*
Jonathan Marigliano
Georgia Bar No.: 470628
SLOVER, PRIETO, MARIGLIANO

& HOLBERT, LLC
Two Ravinia Drive
Suite 1330
Atlanta, Georgia 30346
(404) 856-0040
*Counsel for Defendant Leading*
*Market Technologies, Inc.Counsel for*
*Defendant Leading Market*
*Technologies, Inc.*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| SILVERPOP SYSTEMS, INC., | ) | |
| | ) | |
| Plaintiff | ) | CIVIL ACTION FILE |
| | ) | |
| v. | ) | NO.: 1:12-CV-2513-SCJ |
| | ) | |
| LEADING MARKET | ) | |
| TECHNOLOGIES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the within and foregoing *RESPONSE OF   OF LEADING MARKET TECHNOLOGIES, INC. ("LMT") TO SILVERPOP SYSTEMS, INC'S ("SILVEROP") MOTION FOR SUMMARY JUDGMENT BASED ON GEORGIA LAW* on the following parties by depositing same in the United States Mail, properly addressed with sufficient postage affixed thereupon to ensure delivery to:

John Hutchens

Courtney Ferrell

TROUTMAN SANDERS, LLP

600 Peachtree Street, NE Suite 5200

Atlanta, GA 30308-2216

-31-

This 20th day of September, 2013.


LEADING MARKET TECHNOLOGIES, INC.

By their attorney,

/s/ *Edward T. Dangel, III*
Edward T. Dangel, III BBO # 113580
Dangel & Mattchen, LLP
10 Derne Street Boston, MA 02114
(617) 557-4800
tdangel@danmatllp.com


*s/ Jonathan Marigliano*
Jonathan Marigliano
Georgia Bar No.: 470628
SLOVER, PRIETO, MARIGLIANO
& HOLBERT, LLC
Two Ravinia Drive
Suite 1330
Atlanta, Georgia 30346
(404) 856-0040
*Counsel for Defendant Leading*
*Market Technologies, Inc.Counsel for*
*Defendant Leading Market*
*Technologies, Inc.*